*original*

Mark Resnick
2525 Arapahoe Avenue #289
Boulder, CO 80302
United States

2983 and 3304 Motions for Claim.
Proofs of Claim14178 and 6985.
(and 6980)
AC.s 03035413.

Tel: (303) 885-5222

**Claimant for Administrative Expenses.**
**United States Bankruptcy Court.**
**Southern District of New York.**

In re: Refco et al. Debtors.
Chapter 11
Case No. 05-60006 (RDD)

<u>**APPEAL IN RESPONSE TO ORDER DISALLOWING ADMINISTRATIVE EXPENSE CLAIMS RELATED TO POST-PETITION INCREASES IN FXA CLIENT ACCOUNT BALANCES.**</u>

**Signed:**     Mark Resnick

**Dated:**     May 10, 2007

### 1.     Introductory Statement.

To avoid repetition of material, the original submission has been included as **Exhibit I**. I should be grateful if the Appeal Court would read it in its entirety.

All parties agree that the <u>Macfarland</u> test is determinative of whether administrative claims are allowed. Judge Drain has stated in his judgment on the subject that "this is not a particularly easy motion to decide" and that it is a "close call". Every party including Skadden Arps is agreed that the issue before the Court is difficult to decide. However, Judge Drain did not consider in his decision the "Memorandum of Sale" Docket 563, dated 10 November 2005 (see **Exhibit A**) Skadden Arps and Golenbock Eiseman, attorneys for FXCM, admit that continued trading would give rise to administrative claims in circumstances where there has been no augmentation of the Debtors' Estate with post-petition money payments to the Debtor. Furthermore, Skadden states that:

"To protect RFX customers and RFX's ability to pay its administrative claims, in the event …that…the transactions contemplated by the MOU

1

fail to close...FXCM shall subordinate any administrative expense claim...to the...claims of Dealing Accounts that are customers of RFX.".

In other words, it was the claim of two separate groups of attorneys that administrative claims can be made without an actual completed sale of Customer accounts to FXCM. Nevertheless, both Judge Drain and Bingham McCutchen appear to believe that administrative claims cannot arise. It is, therefore, necessary to analyse the facts of the case and their relationship to Macfarland in detail.

2.  **Post-petition Facts.**

On October 18, 2005 the Claimants received an email from RefcoFX Staff (see **Exhibit 6**) informing them that:

> "RefcoFX Associates LLC (RefcoFx) was formally operating under Chapter 11 Bankruptcy protection, as of October 17/18, 2005."

On November 7, 2005, the Claimants acknowledged an Important Notice to RefcoFx clients throughout the RefcoFx Web site (see **Exhibit 7**):

> "There can be no assurance as to the timing or amount of any payments to customers from their accounts at RefcoFx. In addition, there can be no assurance as to whether customers will be able to have access any gains from trading activity occurring after October 17, 2005. Any return of amounts in customer accounts is subject to the supervision and control of the United States Bankruptcy Court."

On November 11, 2005, the Claimants received an email from RefcoFX Staff (see **Exhibit 6**) informing them:

> "We wanted you to know about an important step in Refco's Chapter 11 filing . . . The MOU provides for the transfer of more than 15,000 retail client accounts of RefcoFX.com, including yours, to an affiliate of FXCM.
>
> Under the terms of the MOU:
>
> - Pending completion of a transaction, RefcoFX clients may continue trading in their accounts without disruption, and

- Upon completion of a transaction, all retail customer positions and orders traded on the FX Trading Station platform will be transferred intact and RefcoFX account holders will be made whole, have access to 100% of their funds, and be able to carry out normal account procedures, including withdrawing funds, as usual. We believe this is the first step in ultimately normalizing trading. The MOU must be approved by the Bankruptcy Court, and the sale of the business will occur through a court-supervised auction open to competing bids. Thus we expect the process to take approximately 30 days to complete. (see **Exhibit 7**)

On December 19, 2005, the Claimants received an email from RefcoFX Staff as follows: (see **Exhibit 6**)

> Dear Client,
>
> We wanted you to know about an important step in Refco's Chapter 11 case.
>
> Judge Robert Drain of the U.S. Bankruptcy Court for the Southern District of New York has approved bidding procedures to auction certain assets of Refco FX Associates LLC, including the company's more than 15,000 retail accounts.
>
> Upon completion of the auction and sale of these assets, which we hope will occur in February, please note the following:
>
> · All Refco FX customer positions and orders traded on the FX Trading Station platform will be transferred intact;
>
> · Those Refco FX account holders will have access to 100% of their funds on deposit, net of their account trading activity since Oct. 17;
>
> · Refco FX account holders will be able to carry out normal account procedures, including withdrawing funds, as usual.
>
> Pending completion of a transaction, RefcoFX clients may continue trading in their accounts.
>
> Refco FX has entered into an agreement to sell the assets to Forex Trading LLC and Forex Capital Markets LLC ("FXCM"), a

3

Futures Commission Merchant registered with the CFTC and a member of the National Futures Association. FXCM has bid $110 million dollars for assets, including the RefcoFX retail accounts.

However, if there is more than one "qualified bidder," an auction would be held on January 26, 2006. A hearing to approve the sale to the winning bidder will be held at the U.S. Bankruptcy Court on January 27. If the court approves the sale, we hope the transaction will close in
February.

"We are gratified with the court's approval of the bidding procedures and look forward to completing the sale process quickly," said Robert Dangremond, Refco's chief executive officer.

Mr. Dangremond also said that any alternative bid would also need to include the assumption of Refco FX customer liabilities, providing a satisfactory outcome for Refco FX customers.

The Claimants sought additional information about the bidding procedures approved by the Honorable Judge Drain on December 19, 2005, to verify the statements made in the December 19, 2005 Client Letter (see **Exhibit 6**).

The Claimants obtained on the Refco docket # 563 the Order of the Court outlining the bidding procedures approved by the Honorable Judge Drain (see **Exhibit 9**).

> **MOTION FOR ORDER UNDER 11 U.S.C. §§ 105(a), 363, 365 AND 1146(c) AND FED. R. BANKR. P. 2002, 6004 AND 6006:**
> **(I) AUTHORIZING THE DEBTORS IN POSSESSION TO SELL REFCO F/X ASSOCIATES, LLC's ASSETS AND EQUITY INTERESTS IN FOREX CAPITAL MARKETS, LLC;**
> **(II) AUTHORIZING THE DEBTORS IN POSSESSION TOENTER INTO PURCHASE AGREEMENT;**
> **(III) AUTHORIZING ASSUMPTION AND ASSIGNMENTOF CERTAIN EXECUTORY CONTRACTS RELATED THERETO;**
> **(IV) APPROVING NOTICE AND BID PROCEDURES, INCLUDING BREAKUP FEE, EXPENSE**
> **REIMBURSEMENT, AND OVERBID PROTECTIONS; AND**
> **(V) SCHEDULING A HEARING TO APPROVE A SALE**

Once again, the Claimants learned the true treatment that was planned by RGL, REFCOFX and FXCM (under legal advices from Skaddens, Arp (once again) for the "postpetition gains & losses" also called the Administrative Claims. It was very different than what customers were informed by REFCOFX in the December 19, 2005 email (see **Exhibit 6**).

Claimants read page 3, clause 4 of Exhibit B of Exhibit 10 as follows:

> "RGL, RFX and FXCM recognize that (a) the result of continued trading in the Dealing Accounts in the ordinary course of business after the Petition Date may give rise to administrative expense claims pursuant to 364(a) and 503(b)(1) of the Bankruptcy Code in favor of holders of Dealing Accounts who have trading gains during the Applicable Period, (b) the amount of cash that RFX has on hand with respect to the Dealing Accounts is less than the aggregate account balances of all Dealing Accounts, (c) the ultimate recovery to holders of RFX Dealing Accounts under the bankruptcy case may be less than 100% of the amount of the Dealing Accounts as the Petition date, (d) as a result of the foregoing, holders of Dealing Accounts who trade after the Petition Date may suffer losses in an amount that is greater than the amount that they may ultimately recover under the bankruptcy case on their Petition date Dealing Account balances, and (e) as a result, the cash remaining at RFX after the termination of trading in Dealing Accounts may not be sufficient to pay all administrative expenses of the kind described in clause (a) of this paragraph. To protect both, RFX customers and RFX's ability to pay its administrative claims."

The Claimants acknowledge the post-petition gains and losses treatment described on **page 3 clause 4 of EXHIBIT B of EXHIBIT 10** and recognized by RGL, RFX and FXCM. The Claimants decided to continue trading during the post-petition period to make gains and retain those gains later as administrative claims.

Nine months into the post petition period, on June 8, 2006, REFCOFX issued finally issued an Important Notice to RefcoFX Clients (see **Exhibit 11**) describing for the first time that there is a possibility that post-petition gains and losses might be netted against pre-bankruptcy account balances, while others (those with losses) would have their losses offset by small recoveries on pre-bankruptcy claims and might end up owning money to RFXA.

5

### 3. Post-petition Benefit.

The crux of Judge Drain's ruling appears at page 15 in his judgment where he states:

> "I believe that in regard to this type of claim, where the dollars and cents that were used, were all supplied prepetition, "benefit" on a post petition basis does not exist."

In support of his position, he cites <u>CIS Corporation</u>, a case which involved a single transaction, namely the payment of rent on a particular date, which was pre-petition. Had the date of the transaction in question been post-petition, the claim would have been allowed. The first matter to resolve is, therefore, to establish the date and number of transactions involved. In the case of Refco, there were daily transactions with active clients. These transactions were in addition to the initial transaction, which was the deposit of trading funds. That initial transaction was pre-petition. So the case of <u>CIS Corporation</u> is very different from <u>Refco et al</u> in respect to the nature and extent of client transactions.

The full list of transactions is shown on an account statement for individual clients stored in the "secure area" of the platform. It cannot be saved to the PC Computer. The FXCM platform has now been disabled for Refco clients and it is impossible to provide these details, although FXCM and Refco would retain records.

The next question is to pose is whether or not the transactions in question were beneficial. There is no reason provided by Judge Drain to accept that benefit is limited to new money. Elsewhere he refers to an actual "augmentation" of funds as being the test of benefit. Again there is no reason why benefit should not be in other forms such as a change in liability between client and the Debtor. Indeed Refco admit that there were changes in liability.

The dated transactions on the account are of two kinds: those that are negative in their effect on the cash balance and those which are positive. The entire sum of negative entries in the account is post-petition transactions, which are beneficial to Refco, being an increase in the obligations and liabilities of the customer to Refco. The entire sum of post-petition transactions which are positive in the account are claims of the Customer against Refco.

The key question is *not* whether there was a net gain or post-petition increase in funds, but where the customer was active or not. Clearly, there would need to be some form of subsequent liquidated settlement (see sections 17-19 **Exhibit I**). This aspect of the original submission is intended to demonstrate that loss-making clients have administrative claims and that depending on their level of activity it will be possible for them to receive a payment.

4.   **Post-Petition Consideration.**

Under the English Common Law, Consideration is not limited to provision of money, goods and services. There is no reason to suppose that the American doctrine is substantially different. RFXA clients took risks and obligation each time they placed a dateable trade. The full list of their transactions, which gave rise to post-petition Consideration, is shown on an account statement for individual clients stored in the "secure area" of the FXCM platform. Again, it cannot be saved to the PC Computer. The FXCM platform has now been disabled for Refco clients and it is impossible to provide these details, although FXCM and Refco would retain records. For further details on Consideration, see **Exhibit I**.

5.   **The Macfarland Test.**

The Macfarland test contains two separate and independent tests, one for the date of consideration and another for the date of benefit. There is no basis to conflate the two tests as Judge Drain has done, when he argued that post-petition consideration is a necessary pre-condition for a post-petition benefit: "I believe that in regard to this type of claim, where the dollars and cents that were used, were all supplied prepetition, 'benefit' on a post-petition basis does not exist." There is no reason for the issues of benefit and consideration to be connected, as is supposed by the Judgment appealed against.

In so far as I understand which of Debtor and claimant in the CIS Corporation case is lessor and which is lessee, this case would appear to be about the date on which consideration occurred because Rent is a payment of consideration and, therefore, the CIS case does not deal with the issue of benefit.

6.   **Further Benefits.**

Binghams pleading suggested that no sale of the client list occurred. In fact this was not true, my name was on the list sold to Gain for $750,000

7

on or around 12 December 2006 as reported in the Latin America. Gain had offered $2.5 million for the Refco FX customer list earlier in 2006 but the Refco FX customers were successful in their objection to the sale.

Troubled Business Reporter and elsewhere:

> **http://bankrupt.com/TCRLA_Public/061212.mbx** REFCO INC: GAIN Capital Wins FXA's Customer List for US$750,000
> REFCO INC: To Present 16 Witnesses at Plan Confirmation Hearing

$750,000 may be considered a small sum, but there is no requirement in law that benefits received be commensurate with claims made. The mere existence of this single post-petition benefit could validate all claims in respect of the benefit test under Macfarland including those of:

> David Bilodeau – 14119 Motion for Claim 4218698 Canada inc. - 14117 Motion for Claim 9016-2355 Québec inc. – 14118 Motion for Claim.

**Exhibit I** further detailed the various classes of benefit that Refco received post petition, but it omitted to mention the payment of dividends by FXCM to Refco during the post-bankruptcy period. These were possible because the trading platform was and is an extremely profitable business. Refco admits as much when they say liabilities to customers changed. In aggregate, the total of client funds declined significantly. Although there was no new money deposited by clients after 17 October, every time a trade occurred clients paid the spread to Refco. Likewise, Refco also received more in interest than it paid on reciprocal/risk free positions. This was the source out of which beneficial dividends to Refco were paid.

### 7. Reading Corporation v. Brown

In special circumstances where there has been gross misrepresentation on basis of which claimants were induced to trade, it may be possible to claim expenses. It is arguable that such misrepresentation did occur. Clients were informed that they could trade "without disruption" (see e-mail appended to **Exhibit I**). The guarantee to trade without disruption was given unconditionally and was not dependent on completion of a sale. Only the access to funds in the usual manner was dependant on completion of a sale. The general tone of the e-mail is intended to allay fear and encourage business as usual.

Furthermore in the MOU 3 dated 10 November 2005 Skadden and other attorneys admit that continued trading may give rise to administrative

claims in circumstances where there has been no augmentation of the Debtors' Estate with post-petition money payments to the Debtor (see **Exhibit A**). In particular, Skadden states that:

> "To protect RFX customers and RFX's ability to pay its administrative claims, in the event …that…the transactions contemplated by the MOU fail to close…FXCM shall subordinate any administrative expense claim…to the…claims of Dealing Accounts that are customers of RFX."

RefcoDocket 563.

The MOU contains detailed provisions for the payment of administrative expenses, which contain no mention of the possibility of a legal objection to such payments. It was prepared by Skadden. On the basis of these statements from the Debtor, a client may reasonably conclude that administrative claims would not subsequently be challenged. Such clients would have undertaken trading activity, obligation and risk in the reasonable expectation that administrative claims would not be challenged. They would forbear from trading at reputable and solvent brokers in the expectation that claims would be met in full. On this basis I make my claims (see **Exhibits B and C**).

8. **Further Submissions concerning the history of the Bankruptcy.**

On the week of October 10, 2005, REFCOFX Customer Service people, throughout the REFCOFX Chat Room, answered to the REFCOFX Account Holders (including the claimants) that the only way to lose their money was either to make bad trades or if Bank of America filed for bankruptcy (see **Exhibits 1 & 2**).

**8a T. H. Lee.**
**Exhibit E** shows the intercompany transfers that were made from FX designated accounts to "securities" designated accounts by T. H. Lee appointed directors in the week prior to bankruptcy. $494 million was transferred on 12 October 2005. After the following weekend, on 17 October 2005 Refco filed for bankruptcy. These transfers are an undue preference to securities creditors at the expense of FX creditors, whereby funds that could and should have been used to settle debts to FX creditors were used in priority to benefit RCM securities creditors. Once funds were in Securities accounts, the fact that FX clients at RCM would be disadvantaged vis-à-vis FX clients at RFXA could be used to disadvantage the entire class of FX creditors. The actions were ultimately

arranged by T H Lee, who is the majority shareholder in Refco. As a result of using FX funds to settle debts with securities creditors, it was possible to avoid Chapter 7 liquidation in which circumstances a secured loan from the Bank of America could be used to pay securities customers, who enjoy statutory protection. The erroneous advice that this maneuver was legal emanated from Skadden Arps (see **Exhibit D** Drew Niv's e-mail). The four Refco Board seats that T H Lee held, and the one Board seat held by a former top executive of Bank of America, finally became untenable when they were forced aside by demands from the Justice Department early in 2006.

As is apparent from e-mails already seen by Judge Drain, the FX clients were encouraged into a false sense of security at the earlier stages of the bankruptcy by being told that they were being auctioned as a business and that they could trade without disruption. The Official Creditor Committee failed to protect their interests and failed to advance the appropriate arguments in Court on their behalf because transferring funds to RCM gave a good deal to the large players on the Committee.

The entire Bankruptcy process has been thus surreptitiously controlled by TH Lee for the purpose of maintaining their banking and financial relationships with large players in priority to small customers. The T H Lee appointed directors sought unnecessarily to protect the security of Bank of America and these directors accordingly sought appropriate legal advice from Skadden. After these crucial events in the spring of 2006 the TH Lee directors stepped aside following demands from the Justice department.

There was improper management both before and after the filing for bankruptcy. It has been explained in the original submission (**Exhibit I**) that FXA employees were told by senior management to tell customers that the problems at Refco only affected Refco CM and did not in any way effect Refco FXA or its customers. Ashley Hutto, Kevin McMillian, Joe Shandly, Jad Fares and Jessica Beckstead are just a few of the many former Refco FXA employees that were telling customers that everything was safe at Refco FXA in the weeks prior to filing on Oct 17th. Many of these employees were upset on Oct 17th, 2005 when they learned from their management that Refco FXA had filed Chapter 11(see Exhibit #1 & #2).

I am pursuing a criminal fraud case against Refco Inc, Refco Board Members, TH Lee. We are confident that under the rule of res judicata the Debtor and others will then be revisiting the full claims, punitive

damages and legal fees of all of the Refco FX customers who have been defrauded by Refco Inc.. I believe that the Refco Board (and Thomas Lee), Management and Bank of America have a lot to answer for. When FXA customers were being told "everything is fine", there was maneuvering in back rooms, transferring funds, etc; and then slammind the door on the RFX customers by filing under Chapter 11. This is egregiously unfair and is criminal fraud.

**8a Request for Constructive Trust (see Exhibit F).**

In circumstances where the Court is suspicious of wrongful acts it may impose a constructive trust. *Hong Kong v Reid A-G for Hong Kong 1994 1 AC 234* is the latest development in this doctrine. The Privy Council, the highest Court in the commonwealth. awarded a trust by way of remedy. *Boardman v Phipps 1967* 2AC 46 and *Regal (Hastings) v Gulliver 1967* 2 AC 134 may also support this doctrine. In circumstances where there has been undue preference between classes of creditor a remedy based on equity -in other words imposition of a Constructive Trust- is an appropriate remedy.

The effect of successful administrative claims would reduce the sum available for the remainder of FX customers who did not trade to a minimal amount. Were it not for a legal loophole, that treats such FX customers differently from Commodity and Securities customers, their position would have been secure. They now find themselves in a position worse off than the Bondholders who were supposed to bear business risk and little better off than the equity holders such as T H Lee. The original submission, **Exhibit E**, has detailed various other misrepresentations and also advanced an interpretation of how the term "collateral" is to be applied within the meaning of the contract read in its entirety. It was claimed that there had been an abuse of customer rights under the contract because collateral was used to secure the debts of Refco.

The Claimants allege that REFCOFX and REFCO have misused the "Collateral and Lending Agreement" clause (see clause 6, page 3 of the REFCOFX Client Agreement – see **Exhibit 5**) to transfer illegally many millions of dollars to other REFCO subsidiary account(s) with the intent to give more money to more important creditors. This statement is also mentioned in the attached email from Drew Niv, the FXCM CEO (see **Exhibit D**) and as shown on the report named "Timeline of transfers between certain REFCO accounts" (EXHIBIT 3).

The last sentence of the "Collateral and Lending Agreement" clause in

the REFCOFX Client Agreement (see **Exhibit 5**) clarifies: "The purpose of the Lending Agreement is to allow RFXA (REFCOFX) to use the currencies, property, depository receipts as collateral."

Collateral within a financial context is used to indicate assets that secure a debt obligation. For example, in the case of a mortgage, the house serves as the collateral for the mortgage loan. This way, the bank is secured against the default risk of the borrower not being able to meet the interest payments. In case of default, the bank can sell the house and get its money (or at least a part of it) back.

Collateral, especially within banking, may traditionally refer to secured lending (also known as asset-based lending) as well as more recently as collateralisation arrangements to secure trade transactions (also known as capital market collateralization). The former often presents unilateral obligations, secured in the form of property, surety, guarantee or other as collateral (originally denoted by the term security). Whereas the latter often presents bilateral obligations secured by more liquid assets such as cash or securities, often known as margin.

Criminal Fraud action is taken against REFCOFX Management, REFCO Management and all other organizations or other people involved, including, but not limited to, T H Lee LBO Fund, REFCO attorneys, and Skadden, Arps, if it is proven such REFCOFX funds were illegally transferred to other REFCO account(s).

According to the records of RCM and based upon the admission by REFCOFX post-petition, REFCOFX transferred customer monies to RCM in order to earn higher interest rates on such money. As of the petition date, RCM owed and still owes a net amount to REFCOFX equal to $83,379,040 (the "FX Receivable").

To clarify where the FX Receivable is coming from, we need to ask the following questions: How many dollars were coming from REFCOFX own assets? What was the amount that should be reasonably transferred for hedging (collateral purpose) for REFCOFX trading activities (if required)? What was the extra amount coming from REFCOFX account(s) without any relation to hedging "collateral" purpose?

The timeline of those REFCOFX funds transfers to other REFCO account(s) is critical information as it can establish the fraudulent intent of the decision makers (**EXHIBIT E**).

REFCOFX and REFCO state these millions of dollars were transfers to other REFCO account(s) to allow REFCOFX to do Hedging activity. The Claimants would like to verify the validity of this allegation.

Since REFCOFX gave wrongful answers about the security of their funds to REFCOFX Account Holders on the days preceding the filing for Chapter 11, the Claimants has reasonable doubts about the integrity of REFCOFX and other REFCO entities regarding the real intent of the REFCOFX millions of dollars transferred to other REFCO account(s); which was supposed to be used by REFCOFX to do Hedging activity.

To verify the validity of the real use of the millions of dollars transferred to other REFCO account(s) would be to closely review the monthly REFCOFX Financial Statements from the beginning of REFCOFX operations until October 17, 2005. This review will establish the real amount of money normally required to allow REFCOFX to do Hedging activity. That should furthermore establish the fraudulent intent of the decision makers to deprive REFCOFX creditors of fair distribution under Chapter 11.

We respectfully ask the Court to obtain from REFCOFX the REFCOFX Financial Statements for the time period aforementioned to closely review and determine the amounts reasonably needed under its normal business activities for Hedging activity.

Furthermore, we respectfully ask the Court to petition other hedging specialists and obtain their opinion on what reasonable amount of money should have been required (under real REFCOFX business operations) to allow REFCOFX to do the Hedging activity.

Furthermore, we respectfully ask the Court to rule on these fund transfers from REFCOFX account(s) to other REFCO account(s), to confirm if those funds transfers in the days preceding the Chapter 11 filing were legal or not and if a Criminal Fraud has occurred. The Claimants believe this to be a very important ruling to build a good understanding around the circumstances around the Administrative Claims.

In sum, there has been a miscarriage of justice that has resulted in a Bankruptcy plan that is detrimental to the entire class of unsecured creditors. It is, therefore, requested that the Court impose a constructive Trust.

I would like to repeat my request for damages against various parties and to reiterate a request for a Constructive Trust for FX clients. I request leave to include the issue of Constructive Trust in my appeal on Administrative Expenses.

**8b FXCM,**
Mr. Drew Niv was a director of Refco FX Japan and serious allegations have been made against him by Japanese clients. However, the fact that funds were transferred from FX designated accounts on 12 October 2005 indicates that the conspiracy to disadvantage FX clients at RFXA by co-mingling their funds in securities accounts originally emanated from Skadden Arps and T H Lee. It subsequently grew to include Milbank and Bingham but there is no evidence yet to impugn the reputation of Mr Niv.

One may wonder what the significance of selling the Refco holding in FXCM is. As reported in Bloomberg, the Geneva based firm ACM bought Refco's stake for $20.6 million (see **Exhibit H**). The managing directors had been particularly concerned to avoid being drawn into a liquidation and would have preferred to avoid a liquidation based on the Chapter 7 Commodity Liquidation arguments advanced by Michael A. McNeil on behalf of FX clients. FXCM may share such a fear that it would be dragged into liquidation. It would, therefore, prefer the remedy of a Constructive Trust.

**9. Refco FX promoted and allowed post petition trading and therefore Refco FX was a Futures and Commodity Broker Dealer in the Post-Petition period. Refco and Refco FX commingled funds and therefore are not eligible to file Chapter 11 and must be a Chapter 7 liquidation as one entity.**

I will be making a motions to:

a. Disregard/Consolidate all entities of Refco and to treat them as one entity

b. Convert FXA & all Refco companies from a Chapter 11 bankruptcy to a Chapter 7 liquidation.

c. Transfer all customer accounts intact or to order Refco to pay their customers the complete balance of their accounts plus 10% interest

The District Court was mistaken by finding that the Debtor is a proper Chapter 11 debtor under section 109 of the Bankruptcy Code. Refco FX

14

Associates LLC is a Commodity Broker and because of this is not eligible for Chapter 11 and therefore is only eligible for Chapter 7 bankruptcy. Further, due to the commingling of customer assets between Refco FX and other Refco companies, I ask that the Court order that all of Refco is not eligible for Chapter 11 bankruptcy and must convert to a Chapter 7 bankruptcy as a single entity. Under Chaprter 7 Commodity Broker Liquidation, the commodity futures customers, the 15000 customers of Refco FX will have their accounts restored to them in whole.

Refco FX, in **both the pre and post petition periods**, was a commodity broker dealer, a leverage broker, and a Futures Commission Merchant selling/brokering commodity futures and commodity options, which were derivatives from foreign currencies. (see Exhibit X, Section 761(8) that specifies the term "futures commission merchant"). Refco FX has commodity customers and are required to be registered. Refco FX has a legal obligation under federal law and various states statutes in how they are to handle their customers assets and accounts. Refco FX failed to register with New York State and the Commodity Futures Commissioner(CTFC). Refco FX has failed to follow New York State Laws to maintain customer accounts "In Trust" and not to commingle the personal assets with their own. Refco FX has consistently misrepresented themselves as an entity that was not a Commodity Broker Dealer in order to keep themselves from being liquidated under Chapter 7 of the Bankruptcy Code. Refco FX has fraudulently committed over 10,000 offences against state and federal law.

10. Refco FX was a Broker Dealer in foreing currency future/commodity contracts **in both the pre and post petition periods**:

Foreign Currency is a commodity and it is defined as a commodity by the federal law as well as by most states. Refco FX customers do not actually take delivery of the multiple currencies they trade. To the contrary, Refco FX customers could not take delivery of foreign currencies through their accounts even if they requested to. Customers can only take delivery in the same currency that their account is denominated in. **Refco FX was dealing in contracts of 10K ar 100K contract lots.** Futures commodity trading takes place with standardize contract sizes. Refco FX only broker deal with contracts of 10K and 100K lots. Refco FX was not in the business of dealing and then delivering currencies to the customers for their use or consumption, nor could they have even if desired. All currency transactions through Refco FX were for speculative or investment purposes. The contracts that Refco FX were dealing in fall completely within the New York law and meaning of a commodity contract. New York Law defines these futures commodity contracts within their state statutes. (see Exhibit X).

**Signed:   Mark Resnick        Dated:** May 08, 2007

15