UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
In re REFCO, INC.                       :
                                        :        07 Civ. 4784 (DLC)
This Document Relates to:               :
                                        :        OPINION AND ORDER
ALL ACTIONS                             :
                                        :
                                        :
----------------------------------------X

Appearances:

Appellant Paul Palley, pro se:
25 Pearman St.
London SE1 7RB
U.K.

Appellant David Bilodeau, pro se:
1050-1 Gilles-Hocquart
Boucherville, QC J4B 8J6
Canada

Appellant Mark Resnick, pro se:
2525 Arapahoe Avenue, #289
Boulder, CO 80302

For RJM, LLC (Plan Administrator for Appellee Refco, Inc.):
Steven Wilamowsky
Bingham McCutchen LLP
399 Park Avenue
New York, NY 10022


DENISE COTE, District Judge:

    Appellants Paul Palley ("Palley"), David Bilodeau

("Bilodeau"), and Mark Resnick ("Resnick") (collectively,

"Appellants"), proceeding pro se, appeal from an April 19, 2007,

Order of the United States Bankruptcy Court for the Southern

District of New York disallowing their requests for payment of

administrative expense claims in connection with the Chapter 11
bankruptcy of Refco, Inc. and its affiliated companies (the
"Order").[1]  By an Order of July 12, 2007, the three appeals were
consolidated.  The consolidation Order accepted the "Statements
of Issues" filed by the Appellants as their appeal briefs.  On
August 3, 2007, RJM, LLC -- the plan administrator for Refco F/X
Associates, LLC ("FXA"), Refco, Inc., and certain of its
affiliates and subsidiaries (collectively, the "Debtors" or
"Appellees") under the Modified Joint Chapter 11 Plan of Refco,
Inc. and Certain of Its Direct and Indirect Subsidiaries (the
"Plan") -- submitted a consolidated responsive brief.[2]  For the
reasons stated below, the April 19, 2007, Order of the
Bankruptcy Court is affirmed.


BACKGROUND

     The following facts are undisputed and taken from the
submissions of the parties, including the documents submitted to
the Bankruptcy Court and designated by the parties as
constituting the record on appeal.  Prior to the bankruptcy,

---

[1] On August 8, 2007, this Court dismissed the appeals filed by
the corporate entities 4218698 Canada Inc./David Bilodeau and
9016-2355 Quebec Inc./Rene Bilodeau for failure to retain
counsel in pursuing appeal.

[2] Palley also submitted documents dated July 20, 2007, and
September 5, 2007, in further support of his appeal, which were
accepted for filing on October 5, 2007.

Refco, Inc., along with its affiliated entities, was a diversified financial services organization with operations in more than a dozen countries and a global institutional and retail client base. FXA, one of Refco, Inc.'s many affiliated and subsidiary entities, was engaged in an on-line retail foreign exchange trading business under the trade name RefcoFX.com. Appellants were FXA customers who held trading accounts with the company. This appeal concerns trading activity that took place in the Appellants' accounts following the bankruptcy filing.

FXA's business was operated pursuant to the terms of a Facilities Management Agreement (the "FMA") between Refco Group Ltd., LLC ("RGL") and Forex Capital Markets, LLC ("FXCM"). Under the FMA, FXCM agreed to service certain foreign exchange accounts for designated affiliates of RGL, including FXA. FXCM serviced the accounts through an internet platform that it owned and operated. FXCM also provided, inter alia, representatives to answer client telephone calls. RGL affiliates, such as FXA, were responsible for, inter alia, due diligence, customer compliance, and maintaining relationships with introducing brokers. FXA also maintained all cash accounts associated with the business, including the customer accounts at issue here. FXA maintained the funds received from clients in various bank accounts, including foreign exchange trading accounts at its

3

affiliate Refco Capital Markets, Ltd., a Bermuda company ("RCM"). Prior to the bankruptcy, clients deposited trading funds with FXA, and FXA issued any disbursements to clients who wished to withdraw funds.[3]

Appellees describe the conduct of FXA's foreign exchange trading business as follows:

> The Refco Affiliates [such as FXA] would serve as the counter-parties to each foreign exchange transaction made by their respective clients. Trades on the FXCM online platform did not require delivery. Consequently, client account balances represented the Refco Affiliate's liability to the client, but did not reflect currencies or investments that the Refco Affiliate actually held. For example, if a client deposited funds in U.S. dollars to its account, the Refco Affiliate would have a liability to the client in an amount equal to the deposit. If the client then bought and sold Japanese yen, and made a profit on the trade, the Refco Affiliate's U.S. dollar liability to the client would increase. Conversely, if the client lost money on its trade, the Refco Affiliate's U.S. dollar obligation to the client would decrease. Throughout the client's trading, the Refco Affiliate would not actually buy and sell Japanese yen in the open market from a third party each time its client "bought" or "sold" yen. Rather, it would, in its discretion, sometimes hedge all or part of its exposure to clients. Sometimes it would not. The Refco Affiliate generated its profit, if any, to the

---

[3] Appellees assert, and appellants do not appear to dispute, that FXA was under no obligation to segregate customer account funds from other operating accounts, and Appellees state that the funds were not segregated. Several lawsuits have been filed in this District, New York State court, and elsewhere regarding Refco, Inc.'s handling of customer and other funds, and criminal actions have been filed against several individuals affiliated with Refco, Inc. As discussed below, the allegations presented in these cases -- while of undoubted import to Refco, Inc., its affiliates, and its former customers -- are not generally relevant to the discrete question presented here.

extent that aggregate client losses exceeded aggregate
client gains, net of any hedging activity engaged in
by the Refco Affiliate.

As stated in documents submitted to the Bankruptcy Court,

"[u]ntil the filing of the chapter 11 cases, FXA had been a very

profitable business for Refco."

Following the revelation of executive misconduct and

accounting irregularities at Refco, Inc.,[4] the Debtors filed

voluntary petitions for relief under Chapter 11 of Title 11 of

the United States Code (the "Bankruptcy Code") on October 17,

2005 (the "Petition Date").  Pursuant to 11 U.S.C. § 541(a), an

estate was then created consisting of all of FXA's property and

assets, and FXA was prohibited under 11 U.S.C. § 362 from

permitting clients to withdraw funds from their accounts.  In

addition, according to Appellees' submissions below, FXA was

similarly rendered unable to access the customer funds it had

deposited with RCM, also a debtor in the Chapter 11 cases.  In

light of these developments, Refco affiliates, including FXA,

also stopped accepting deposits to client accounts on the

Petition Date.[5]

---

[4] See generally Jenny Anderson, Refco Sells Futures Unit and
Seeks Bankruptcy Protection, N.Y. Times, Oct. 18, 2005.

[5] Appellants note that some clients were permitted -- in error or
otherwise -- to deposit additional funds into their accounts
after the Petition Date.  While Palley states that he was able
to transfer funds between various accounts held with FXA,
neither he nor the other Appellants claim that they deposited
additional funds after the Petition Date.

As Appellees describe in their brief, although post-Petition trading would ordinarily not have been permitted under these circumstances, two factors contributed to a decision to permit trading to resume shortly after the Petition Date. First, the internet platform operated by FXCM and through which customers conducted their trading remained operational, and thus FXA had the ability to permit post-Petition trading using the existing customer account balances. Second, shortly after the Petition Date, FXCM approached the Debtors regarding the potential acquisition of, _inter alia_, the retail foreign exchange accounts and related cash balances held by FXA, as well as a 35% stake in FXCM then held by RGL. As the documents submitted to the Bankruptcy Court -- and the Appellees' brief to this Court -- indicate, FXA and FXCM believed that the value of both the customer accounts and of RGL's 35% stake in FXCM would be maximized, and a successful sale more likely, if the FXA customer accounts remained active pending the acquisition.[6]

---

[6] For example, in the Debtors' November 19, 2005, motion to the Bankruptcy Court seeking authorization for the FXCM sale and approval of bid procedures, the Debtors explained:

In connection with entering into the FMA, [RGL] acquired a 35% limited liability company interest in FXCM and currently holds that interest. FXCM has also been a very profitable business, providing additional income to [RGL] through its 35% interest. However, trading in the Refco Customer Accounts comprises approximately 30% of FXCM's business and contributes approximately 30% of its revenues, so the freezing of the FXA accounts upon the filing of the chapter 11

Thus, following three weeks of negotiations, an agreement was reached on November 9, 2005, and embodied in a Memorandum of Understanding signed by representatives of Refco, Inc. and FXCM (the "MOU").  Under the terms of the MOU, trading on the FXCM-maintained internet platform would be permitted to resume pending completion of the acquisition and confirmation by the Bankruptcy Court.  Appellees' state, however, that (1) FXA did not engage in any hedging activity during the post-Petition period, (2) the "actual dollars and cents in the [Appellants'] accounts were 'frozen' as a result of the bankruptcy," and (3) as a result, "post-petition trading merely changed the amount of FXA's nominal liabilities to its clients on account of their pre-petition claim amounts," and did not correspond to any "real" buying and selling on the open market.  Similarly, while clients could direct trading in their accounts, they could not contribute additional funds or receive any disbursements.

As the Appellants have each highlighted, a Stipulation entered into on November 19, 2005, in connection with the MOU

cases has adversely affected FXCM's business and the value to [RGL] of the 35% interest.  Moreover, if FXA does not preserve its business, through a sale of accounts to a third party or otherwise, the value of its 35% interest in FXCM likely would be materially adversely affected.  Thus, maintenance of the Refco Customer Accounts at FXA is essential not only for maximizing value of FXA, but also for maximizing the value of [RGL]'s 35% interest in FXCM.

and so-ordered by the Bankruptcy Court on December 19, 2005, states that:

> RGL, [FXA], and FXCM recognize that . . . the result of <u>continued trading</u> in the Dealing Accounts in the ordinary course of business after the Petition Date <u>may give rise to administrative expense claims</u> pursuant to §§ 364(a) and 503(b)(1) of the Bankruptcy Code in favor of holders of Dealing Accounts who have trading gains during the Applicable Period.

(Emphasis added).  The stipulation then provides that, in the event that there is "inadequate cash in the [FXA] estate to pay both any administrative priority claims of the holders of the Dealing Accounts of customers of [FXA] and the administrative priority claims of FXCM," and the transaction contemplated in the MOU fails to close as a result of a breach by FXCM, FXCM will subordinate its administrative expense claims to any administrative expense claims held by FXA customers.

FXA customers, including the Appellants, had been informed of the bankruptcy filing, as well as the attendant freeze on their accounts, via email on October 18, 2005.  As noted by the Bankruptcy Court, this email did not mention potential post-Petition trading, but did state that:

> Efforts are being made by Refco to raise capital in order to re-pay creditors and to meet obligations. Current information indicates there are numerous potential purchasers who are interested in buying the futures division and other entities of the Refco Group.  Refco anticipates that the proceeds will help expedite the repayment of customer funds to [FXA] and that any freeze of client funds/accounts is temporary.

> Please note that the process that has begun will last
> weeks or months, and not hours or days.

Once the MOU regarding the potential sale to FXCM had been completed, customers were also informed of this development.  In an email dated November 11, 2005 and submitted to the Bankruptcy Court below, the FXA told customers, <u>inter alia</u>, that under the terms of the MOU, (1) their accounts would be transferred to an affiliate of FXCM, (2) "[p]ending completion of a transaction, [FXA] clients may continue trading in their accounts without disruption," and (3) "<u>[u]pon completion of a transaction</u>, all retail customer positions and orders traded on the FX Trading Station platform will be transferred intact, and [FXA] <u>account holders will be made whole</u>, have access to 100% of their funds, and be able to carry out normal account procedures, including withdrawing funds, as usual" (emphasis added).[7]

In an email dated December 19, 2005, and also provided to the Bankruptcy Court, customers were informed that the Bankruptcy Court had approved bidding procedures for the sale of the FXA customer accounts.  The email also reiterated the

---

[7] Bilodeau has also submitted an email he claims was sent on November 7, 2005, which informed customers of FXCM's potential interest in an acquisition, but further warned that "[t]here can be no assurances as to the timing or amount of any payments to customers from their accounts at [FXA] . . . . [or] as to whether customers will be able to access any gains from any trading activity occurring after October 17, 2005."

information regarding post-Petition trading conveyed on November
11.

    As described by the Bankruptcy Court, "despite or
notwithstanding the efforts of [FXA], the proposed transaction
with FXCM or any higher and better proposal made at the auction
did not come to pass."  As a result, "there was no transfer of
the [FXA] accounts, which have remained, with the money that was
in them on the petition date, at [FXA]."  Trading on the FXA
internet platform nevertheless continued.  In an email submitted
by Bilodeau, which he states was sent on June 8, 2006, FXA
explained the decision to allow post-Petition trading after the
failure of the FXCM transaction as an effort to "facilitate a
transaction for [FXA] accounts and assets," reasoning that "were
trading to be halted, it is much less likely that a buyer would
be found for the accounts."  On July 31, 2006, however, under
the terms of the Plan and § 365 of the Bankruptcy Code, FXA
rejected the client agreements that governed its relationships
with retail customers and, at FXA's request, FXCM then disabled
the online trading platform.  FXA customer account balances have
been frozen since that time.

    Prior to the confirmation of the Plan by the Bankruptcy
Court in December of 2006, each of the Appellants (along with
many others) filed a claim for payment of an administrative
expense claim for his post-Petition trading profits.  Appellants

asserted in their claims that they engaged in post-Petition trading, that that trading resulted in an increase in their account balances, and that their trading conferred a benefit on FXA and its estate because it allowed the company "to continue to operate as a going concern," which "augmented the value of [FXA] for sale purposes and/or lent it the ability to reorganize."[8]  The Plan Administrator filed an Omnibus Objection to Request for Payment of Administrative Expense Claims Related to Post-Petition Increases in FXA Client Account Balances on February 9, 2007, and Appellants responded.  At a hearing on April 11, 2007, The Honorable Robert D. Drain of the Bankruptcy Court ruled from the bench and disallowed the Appellants' requests for administrative expense priority, and issued an Order to that effect on April 19, 2007.  This appeal followed.

DISCUSSION

A district court "may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree."  Rule 8013, Fed. R. Bankr. P.  On appeal, the legal conclusions of the Bankruptcy Court are reviewed de novo, but the findings of fact are reversed only when they are "clearly erroneous."  Kuhl v. United States, 467 F.3d 145, 147 (2d Cir. 2006) (citation omitted) (per

---

[8] See, e.g., Request of David Bilodeau for Payment of Administrative Claim, In re Refco, Inc., et al., No. 05-60006 (Bankr. S.D.N.Y. Aug. 30, 2006).

curiam); In re Worldcom, Inc., 339 B.R. 836, 840 (S.D.N.Y. 2006).  The Bankruptcy Court's determination that Appellants' claims are not entitled to administrative expense priority is a conclusion of law.  In re Bethlehem Steel Corp., 479 F.3d 167, 172 (2d Cir. 2007).  "The burden of proving entitlement to priority payment as an administrative expense rests with the party requesting it."  Id. (citation omitted).

"Because the presumption in bankruptcy cases is that the debtor's limited resources will be equally distributed among his creditors, statutory priorities are narrowly construed."  Id. (citing Trustees of Amalgamated Ins. Fund v. McFarlin's, Inc., 789 F.2d 98, 100 (2d Cir. 1986)); see also Howard Delivery Serv., Inc. v. Zurich Am. Ins. Co., 126 S. Ct. 2105, 2116 (2006); Nathanson v. NLRB, 344 U.S. 25, 29 (1952).  Under 11 U.S.C. § 507(a)(1), the administrative expenses of the debtor-in-possession receive highest priority in corporate bankruptcy proceedings.  In re Bethlehem Steel, 479 F.3d at 172.  Section 503(b)(1)(A) of the Bankruptcy Code defines administrative expenses as the "actual, necessary costs and expenses of preserving the estate, including . . . wages, salaries, and commissions for services rendered after the commencement of the case."  Id. (citation omitted).  As the Court of Appeals explained in McFarlin's,

> Congress granted priority to administrative expenses
> in order to facilitate the efforts of the trustee or
> debtor in possession to rehabilitate the business for
> the benefit of all the estate's creditors.  Congress
> reasoned that unless the debts incurred by the debtor
> in possession could be given priority over the debts
> which forced the estate into bankruptcy in the first
> place, persons would not do business with the debtor
> in possession, which would inhibit rehabilitation of
> the business and thus harm the creditors.

McFarlin's, Inc., 789 F.2d at 101 (citation omitted); see also 4

Collier on Bankruptcy ¶ 503.06[2] (15th ed. 2007).  Guided by

this statutory purpose, the Court of Appeals has made clear that

> an expense is administrative only if it arises out of
> a transaction between the creditor and the bankrupt's
> trustee or debtor in possession, and only to the
> extent that the consideration supporting the
> claimant's right to payment was both supplied to and
> beneficial to the debtor-in-possession in the
> operation of the business.

In re Bethlehem Steel, 479 F.3d at 172 (quoting McFarlin's, 789

F.2d at 101 (citations omitted)).  Typical examples of

administrative expense claims include "outlays for repairs,

upkeep, freight, insuring the value of the property and the

hiring of custodians by the trustee."  4 Collier on Bankruptcy ¶

503.06[1].

If a court concludes that a claim qualifies for

administrative expense priority, the estate becomes liable for

"the reasonable value of any benefits conferred."  NLRB v.

Bildisco & Bildisco, 465 U.S. 513, 540 n.8 (1984).  This measure

is used in recognition of the fact that "the purpose of

according priority in these cases is fulfillment of the equitable principle of preventing unjust enrichment of the debtor's estate, rather than the compensation of the creditor for the loss to him." <u>Am. Anthracite & Bituminous Coal Corp. v. Leonardo Arrivabene, S. A.</u>, 280 F.2d 119, 126 (2d Cir. 1960).

Finally, following <u>Reading Co. v. Brown</u>, 391 U.S. 471 (1968), it is also well-established that "damages resulting from the negligence of a receiver" during the post-Petition period give rise to administrative expense claims. <u>Id.</u> at 485. In reaching this conclusion, the Supreme Court reasoned that where a tort victim –- in essence, an involuntary creditor of the estate –- "suffer[s] grave financial injury" as a result of the negligence of the bankrupt's estate, <u>id.</u> at 477, it is "natural and just" to afford such claims priority of distribution, <u>id.</u> at 482, even though, as the leading treatise notes, such "claims d[o] not arise from transactions that were necessary to preserve or rehabilitate the estate." 4 <u>Collier on Bankruptcy</u> ¶ 503.06[3][b][i].

I.   Appellants' Claims Under § 503(b)(1)

As the Bankruptcy Court noted, the parties do not dispute the applicable law –- namely, the standard established in <u>McFarlin's</u>, 789 F.2d at 101, recently reaffirmed in <u>In re Bethlehem Steel</u>, 479 F.3d at 172. The parties do, however,

vigorously dispute the proper application of this standard in
this case.

Appellants assert, in sum, that FXA's communications
regarding post-Petition trading and the potential sale of their
customer accounts to FXCM -- and the promised "100%" recovery
that would have resulted had the sale gone through -- induced
them to recommence trading.  Appellants further assert that the
Debtors' own submissions to the Bankruptcy Court in connection
with the potential sale to FXCM establish that Appellants' post-
Petition trading conferred a substantial benefit on FXA, i.e.,
that the post-Petition trading sustained FXA as a going concern
and thereby enhanced the value of FXA in the eyes of its
potential purchasers, including FXCM.  Although the customer
accounts held by FXA were not ultimately sold to FXCM or to
anyone else, Appellants maintain that this post-Petition benefit
is sufficient to establish an administrative expense claim under
McFarlin's.[9]

Echoing the conclusions reached by the Bankruptcy Court,
Appellees counter that because Appellants were not able to and

---

[9] Appellants also note that, according to news reports, FXA sold
its client list to a third party in the post-Petition period,
and argue that their post-Petition trading contributed to the
sale value of that list.  This argument was not raised below
and, in any event, fails insofar as the customer list does not
appear to have been limited to active customers, and thus the
connection between the post-Petition trading and the value of
the list is tenuous.

did not deposit new funds into their accounts after the Petition
Date, their post-Petition activities were not supported by any
post-Petition consideration.  Appellees further argue that
enhancement of the value of FXA in anticipation of a potential
sale is too speculative and uncertain of a post-Petition
"benefit" to support an administrative expense claim.

Having reviewed the parties' submissions, the record on
appeal, and the case law interpreting § 503(b)(1), the
Bankruptcy Court's conclusion that the Appellants are not
entitled to administrative expense priority for their claims
must be affirmed.  First, with regard to the question of whether
Appellants supplied any post-Petition consideration in
connection with their post-Petition trading -- a question that
the Bankruptcy Court does not appear to have addressed directly
-- Appellants urge that consideration is not a concept "limited
to provision of money, goods and services," and, as a general
matter, it is indeed well-established that bargained-for
consideration can consist of "an act other than a promise, or a
forbearance, or the creation, modification, or destruction of a
legal relation." Restatement 2d of Contracts § 71.  Moreover,
some courts have held that, under § 503(b)(1), "[c]onsideration
exists generally where [] the debtor-in-possession induces the
creditor to perform postpetition." In re Patient Educ. Media,
Inc., 221 B.R. 97, 101 (Bankr. S.D.N.Y. 1998); see also In re

16

Native Am. Sys., Inc., 351 B.R. 135, 139 (B.A.P. 10th Cir. 2006).  Thus, insofar as Appellants' post-Petition trading constitutes an "act" that was induced by the communications sent by FXA, it could be said that Appellants provided some form of consideration to FXA during the post-Petition period.[10]

     If the resumption of trading is the consideration claimed here, however, it must be noted that Appellants appear to have already received the reciprocal benefit bargained for in exchange for that consideration.  When trading resumed, all FXA account holders were given the opportunity to resume trading. Those that did resume took the risk that their account balances would increase or decrease based on their trading instructions and -- in the event the transaction with FXCM closed -- that they would be entitled to the full, "100-cent" dollar value of their FXA account, as increased or decreased by their post-Petition trading.  Thus, Appellants have already received the

---

[10] Palley also claims that the transfers he made between his various FXA accounts during the post-Petition period, as well as the profits made on his trades, were a form of consideration. It is seemingly beyond dispute, however, that transfers between accounts, all of which were held by FXA in the pre-Petition period, did not yield new, post-Petition consideration, as no new funds came into FXA's possession as a result.  Moreover, Appellants argue that FXA benefited from the fees and commissions that were incurred as a result of their post-Petition trading.  As Appellees point out however, such fees and commissions were charged against existing account balances -- i.e., Appellants did not pay them with post-Petition funds -- and, more importantly, the profits garnered by Appellants (and the resulting increase in FXA's liability to the Appellants) would appear to far outweigh such charges.

benefit of the bargain they struck post-Petition with FXA:
namely, the opportunity to increase (or decrease) their pre-
Petition account balances.  It is not apparent why Appellants
should be entitled to anything more than an adjustment to their
pre-Petition balances that reflects the gains they were able to
achieve through their post-Petition trading.

Second, to satisfy the requirements of § 503(b)(1), the
consideration must be "both supplied to and beneficial to the
debtor-in-possession in the operation of the business," In re
Bethlehem Steel, 479 F.3d at 172 (quoting McFarlin's, 789 F.2d
at 101 (citations omitted and emphasis added)), and Appellants'
claims founder for this reason as well.  In light of the "equal
distribution objective underlying the Bankruptcy Code, and the
corollary principle that provisions allowing preferences must be
tightly construed," Howard Delivery Serv., 126 S. Ct. at 2116,
courts of this and other Circuits have endeavored to ensure that
any administrative expense claims correspond, in a real and
tangible sense, to "actual, necessary costs and expenses of
preserving the estate."  11 U.S.C. § 503(b)(1)(A) (emphasis
added).[11]  Thus, while the word "benefit" is certainly

---

[11] "The 'benefit' analysis is a way of testing whether a
particular expense was 'necessary' to preserve the estate.  The
underlying reasoning is that an expense incurred in exchange for
something that is not beneficial to the estate cannot be
considered an expense necessary for preserving the estate."  4
Collier on Bankruptcy  ¶ 503.06[3][b].

susceptible to broad and creative interpretations, courts permit administrative expense priority to be afforded only where there has been a "concrete, actual benefit" conferred, and not simply a "potential" benefit contingent on a future event.  Ford Motor Co. v. Dobbins, 35 F.3d 860, 866-67 (4th Cir. 1994) (collecting cases).

Following this line of reasoning, courts have held that "[t]hat which is thought to have some potential benefit, in that it makes a business more likely salable . . . is too speculative to be allowed as an 'actual, necessary cost and expense of preserving the estate,'"  Id. at 867 (quoting 11 U.S.C. § 503(b)(1)(A)); see also In re Subscription Television of Greater Atlanta, 789 F.2d 1530, 1532 (11th Cir. 1986); In re CIS Corp., 142 B.R. 640, 644 (S.D.N.Y. 1992); In re Enron Corp.,  279 B.R. 695, 705-06 (Bankr. S.D.N.Y. 2002); In re R.H. Macy & Co., Inc., 170 B.R. 69, 78 (Bankr. S.D.N.Y. 1994); In re Drexel Burnham Lambert Group Inc., 134 B.R. 482, 488 (Bankr. S.D.N.Y. 1991). Conversely, however, it has also been held that administrative expense priority is appropriate where "the benefit provided had "a present value at the time" it was conferred, "even if . . . the benefit turned to dust" in light of the ultimate failure to rehabilitate or sell the business.  In re Klein Sleep Prods., Inc. v. Costich, 78 F.3d 18, 26 (2d Cir. 1996).

As these cases indicate, and as the Bankruptcy Court correctly concluded, Appellants' claims fall squarely into the category of "potential" benefits to the debtor's estate that, while undoubtedly "beneficial" to the estate in a broader sense -- and, indeed, sought-after by the estate for that reason -- do not give rise to administrative expense claims under 11 U.S.C. § 503(b)(1).  Seeking to avoid this result, Appellants argue that courts have granted administrative expense priority in cases where the benefit at issue was as seemingly abstract and intangible as the benefit at issue here.  For example, in cases such as Peters v. Pikes Peak Musicians Ass'n, 462 F.2d 1265 (10th Cir. 2006), and In re Native Am. Sys., Inc., 351 B.R. 135, a claimant's willingness and ability to perform a certain service during the post-Petition period -- despite the fact that such services were not in fact utilized by the estate -- was found to be a sufficiently concrete benefit to support an administrative expense claim.  In these cases, however, "the service specifically bargained for was availability," Peters, 462 F.2d at 1272, and such availability had been assigned a specific, contracted-for value by the parties[12] -- i.e., the

---

[12] In Peters, the debtor was an orchestra whose contract with local musicians provided that, "as long as the musicians remained available, they would be compensated for a minimum number of pay periods, regardless of whether the Orchestra called upon them to play." 462 F.2d at 1272.  Similarly, in In re Native American Systems, the debtor was "in the business of

parties had assigned the claimant's availability to perform a service a "present value at the time" of contracting.  In re Klein Sleep Prods., 78 F.3d at 26.  Here, by contrast, as in In re CIS Corp., 142 B.R. 640 (S.D.N.Y. 1992), the potential augmentation of the value of FXA is a "speculative benefit [that] is not quantifiable," id. at 644, and thus not susceptible to administrative expense treatment.[13]

II.  Appellants' Additional Claims

Appellants also contend that, in the emails of November 11 and December 19, 2005, discussed above, FXA misrepresented the consequences that would follow resumption of trading after the Petition Date, and that such misrepresentations -- for example, that trading would resume "without disruption" and the alleged corollary implication that post-Petition trading profits would

reselling technical service contracts to governmental entities," and its contracts with the claimant-vendors provided that those vendors would be paid "whether the customer regularly use[d] the vendor's services or d[id] not use them at all." 351 B.R. at 137.

[13] Indeed, as noted above, although Appellants filed administrative expense claims roughly equal to the amount of their post-Petition trading profits, if a court were to find that they were entitled to such priority, it is far from certain that "the reasonable value of [the] benefits conferred" on FXA by those trades, Bildisco, 465 U.S. at 540 n.8, would be equal to the profits garnered by Appellants.  Rather, a court would have to arrive at some approximation of the pro-rata increase in the potential sale value of FXA attributable to each Appellant's post-Petition trading, as that would be the relevant "benefit" conferred under § 503(b)(1).

be paid out in full -- give rise to administrative expense claims under Reading Co. v. Brown, 391 U.S. 471 (1968).  The Bankruptcy Court reviewed the emails in question and did "not find a specific misrepresentation in any of the emails, even recognizing that the recipients might not have been knowledgeable about the rules governing administrative claims," and thus rejected Appellants' Reading Co. claims.

The Bankruptcy Court's ruling on this issue must be affirmed.  As the review above demonstrated, while the emails did trumpet the fact that FXA customers would be made whole after the sale to FXCM, those communications did make clear that such a recovery would be possible only "[u]pon completion of a transaction."  Read in that context, the further statement that trading would resume "without disruption" does not amount to a misrepresentation regarding how post-Petition trading profits would ultimately be handled.[14]

---

[14] Similarly, the argument that the August 19, 2005, stipulation entered into in connection with the MOU -- in which RGL, FXA, and FXCM recognized that post-Petition trading could result in administrative expense claims -- cannot be read as a misrepresentation or admission by FXA or the other Debtors that would support Appellants' claims.  On its face, this document does nothing more than recognize that such trading "may give rise to administrative expense claims" (emphasis added), and provide a contingency plan in case that scenario came to pass.  Thus, this document does not represent a commitment or communication to account holders that post-Petition trading would be given administrative expense treatment.

In addition, to the extent that the Appellants'
constructive trust claim has not been abandoned, it can be
swiftly rejected.  As Appellants note -- and Palley, at least,
concedes in withdrawing his constructive trust arguments -- this
claim was the subject of an adversary proceeding before the
Bankruptcy Court, brought by an ad hoc committee of FXA
customers that included each of the Appellants, in which Judge
Drain granted FXA's motion for judgment on the pleadings with
respect to this claim.  Order Granting Defendant Refco F/X
Associates, LLC's Motion for Judgment on the Pleadings, Forex
Trading LLC and The Ad Hoc Refco F/X Customer Committee v. Refco
F/X Associates, LLC and Refco Capital Markets, Ltd., No. 06-1748
(Bankr. S.D.N.Y. Nov. 27, 2006).  This appeal is not a forum for
an untimely collateral attack on that judgment.

Finally, in light of the effort expended by the Appellants
documenting alleged pre-Petition wrongdoing by Refco, Inc. and
its executives and affiliates, including FXA, two points should
be noted.  First, whatever the merit of these allegations -- a
question which, it appears, is currently the subject of civil
and criminal litigation -- those merits are essentially
irrelevant to the question at issue here, namely, whether these
Appellants are entitled to administrative expense priority with
respect to their post-Petition trading profits.  While these
Appellants, and other FXA and Refco, Inc. customers, may

23

ultimately be entitled to some form of compensation for losses suffered as a result of the events leading up to the bankruptcy, this is not the appropriate forum for deciding that broader question.

Second, as noted above, holding that Appellants are not entitled to administrative expense priority with respect to their post-Petition trading profits is in no way inequitable or unreasonable.  Like all of FXA and Refco, Inc.'s creditors, Appellants undoubtedly have experienced a loss as a result of the bankruptcy, but their post-Petition trading -- the conduct relevant to this appeal -- caused them to experience nothing more than an increase in the value of their claims against FXA. Although the Bankruptcy Court withheld judgment on how Appellants' claims will ultimately be handled, it noted that it is likely that the post-Petition profits "will be reflected in an adjustment of [Appellants'] prepetition claims."  Given, as Appellees repeatedly note, that those who did not trade post-Petition hold unsecured, pre-Petition claims in an amount equal to their pre-Petition account balances, holding that those who did profit from post-Petition trading will simply have their unsecured, pre-Petition claims ratably increased seems, indeed, "natural and just."  Reading Co., 391 U.S. at 482.

CONCLUSION

The April 19, 2007, Order of the Bankruptcy Court is affirmed.   The Clerk of Court shall close the case.


SO ORDERED:

Dated:    New York, New York
          January 14, 2008

                                    _____
                                         DENISE COTE
                                 United States District Judge

25

COPIES SENT TO:

Paul Palley
25 Pearman St.
London SE1 7RB
United Kingdom

Steven Wilamowsky
Bingham McCutchen LLP
399 Park Avenue
New York, NY 10022

Mark Resnick
2525 Arapahoe Avenue #289
Boulder, CO 80302

David Bilodeau
1050-1 Gilles-Hocquart
Boucherville, QC J4B 8J6
Canada